UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLUG POWER INC., <br><br> Plaintiff, <br><br> v. <br><br> UBS AG and UBS FINANCIAL SERVICES INC., <br><br> Defendants. | **COMPLAINT** <br><br> Civ. No. _____ <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Plug Power Inc. ("Plug Power"), a client of UBS AG's brokerage subsidiary, UBS Financial Services (together "UBS"), brings this action for rescission and damages for violations of the federal Investment Advisers Act of 1940, Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U.S.C. §78j(b), Securities and Exchange Commission Rule 10(b)-5, 17 C.F.R. 240.10(b)-5, the New York General Business Law § 349, common law fraud, breach of fiduciary duty, breach of contract, and negligent misrepresentation. Defendant complains and alleges as follows:

## NATURE OF THE CASE

1. This case arises from UBS's actions as an investment advisor for Plug Power. UBS, as investment advisor, improperly invested approximately $62,875,000 in unsuitable and illiquid investments called "auction rate securities" ("ARSs"). ARSs are bonds with interest rates that are re-set through periodic auctions. The Plug Power assets placed into ARSs by UBS represent approximately 44% of Plug Power's investment portfolio.

2. Plug Power first opened its investment account with UBS in 2005. According to the investment agreement between Plug Power and UBS, the Corporate Cash Management Account Agreement and Grant of Discretion ("Account Agreement"), all investments must conform to Plug Power's investment policy (the "Policy"). According to the Policy, ARS investments are allowed only to the extent, *inter alia*, such ARSs are "without interest rate caps." The Policy also mandates that all investments conform to Plug Power's liquidity requirements.

3. The Policy was provided to UBS in connection with execution of the Account Agreement and is referenced in Section 5.a of the Account Agreement.

4. Despite the Plug Power Policy and UBS's knowledge of the Policy, UBS purchased ARSs for Plug Power's portfolio that are subject to interest rate caps. In addition, the ARSs purchased by UBS for Plug Power do not comply with the Policy's stated liquidity requirements.

5. UBS also represented to Plug Power that ARSs were highly liquid and safe and that they were virtually the equivalent to money market investments or cash. That representation was false and known to be false by UBS representatives. UBS knew that Plug Power would and did rely on that representation.

6. In a call with UBS investment advisor Louis Paster on October 2007, Plug Power Chief Financial Officer Gerry Anderson raised concerns about the ARS products, and particularly, about a recent "spike" in interest rates on ARSs. Paster did not disclose to Anderson the fact that the "spike" was caused by failures in the ARS auctions and by the need for issuers of ARSs to waive rate caps in order for ARSs to clear the auction. Plug Power did not learn this fact until mid-April 2008. In that October 2007 call, Anderson reiterated that Plug Power did not want to risk its capital in order to "chase" higher rates and that Plug Power needed these funds

2

for working capital. Instead of moving Plug Power's investments into liquid assets, such as a Treasury bills, UBS kept the same ARS investments that violated Plug Power's investment policy.

7. On February 14, 2008, Paster contacted Plug Power to explain that the auction rate securities market "seized up" and that the liquidity Plug Power had depended upon was "unavailable." Paster said the "liquidity problem" could be resolved in "90 days or perhaps in one year (or longer)."

8. Plug Power brings this action to remedy UBS's mismanagement of Plug Power's investments.

## THE PARTIES

9. Plaintiff Plug Power is a Delaware corporation with its principal place of business at 968 Albany-Shaker Road, Latham, New York 12110.

10. Defendant UBS AG ("UBS AG") is headquartered in Zurich, Switzerland and has offices throughout the world, including in New York, where UBS offices are located at 299 Park Avenue, New York, New York 10171.

11. Defendant UBS Financial Services Inc. is a Delaware corporation headquartered at 800 Harbor Blvd., Weehawken, New Jersey 07086. UBS Financial Services Inc. is authorized to do business in New York and does business in the State of New York.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as several of the causes of action arose from Defendants' violation of federal law, including the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U.S.C. §78j(b) and Securities and Exchange

Commission Rule 10(b)-5, 17 C.F.R. 240.10(b)-5. To the extent that the Court has federal question jurisdiction, it also has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), in that Defendants reside in this District, as that term is defined in § 1391(c) and pursuant to § 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

14. UBS was chosen by Plug Power to act as its Financial Advisor in 2005, and since that time Plug Power has had a relationship of trust and confidence with UBS, whereby Plug Power's financial interests and objectives are to come before the self-interests of UBS.

15. In conjunction with its retention of UBS as investment advisor, Plug Power and UBS entered into a Corporate Cash Management Account Agreement and Grant of Discretion ("Account Agreement").

16. The Account Agreement gives UBS discretionary authority to enter orders on an agency basis on behalf of Plug Power, as long as the investments conform with the investment policies of Plug Power as outlined in its Corporate Investment Policy ("the Policy).

17. Under the Policy, UBS could invest in ARSs under certain, limited conditions. ARSs are state, municipal or corporate bonds with interest rates that are re-set through periodic auctions. ARSs are sold both with capped interest rates and uncapped interest rates.

18. UBS is the second largest underwriter in the $300 billion ARS market and UBS's involvement in this market has generated substantial revenue for Defendants.

19. In addition to its customary brokerage fees, UBS collects fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARSs.

20. At all times during the period that UBS acted as its investment advisor, Plug Power's investment policy focused on liquidity.

21. The stated objectives of the Policy are "to provide as high a level of current income as is consistent with the preservation of capital, the maintenance of liquidity, and in order to promote tax efficiency."

22. One of the approved investment vehicles under the Policy are "Floating and Auction Rate Securities without interest rate caps provided that the availability of principal is consistent with approved liquidity provisions and the "term" or "reset period" is consistent with approved maturity provisions."

23. Further, under the "Marketability" guidelines of the Policy, "All securities must have a readily available, liquid market. In addition, the investment manager will be prepared to provide market liquidity on securities purchased for [Plug Power]."

24. According to the "Maturity/Portfolio Duration" the investments must have a "Liquid Focus." The liquid focus should be such that the "portfolio will be constructed so liquidity is preserved to meet operating cash requirements and disbursements needs on a same or next day basis."

25. Any investment not specifically identified in the Policy is not approved for investing, absent consent of Plug Power's Chief Financial Officer. Further, any exceptions to the Policy are prohibited without the prior approval of the Chief Financial Officer.

26. UBS represented that it understood Plug Power's Investment Policy and agreed to manage Plug Power's investments in accordance with that Policy and its underlying investment objectives.

27. In July 2006, UBS purportedly received a copy of an investment policy which allowed ARS investments <u>with</u> interest rate caps, but that policy was never adopted or approved by Plug Power.

28. In January 2007, Plug Power notified UBS, via a January 9, 2007 email, that the 2006 document did not represent Plug Power's investment policy, and transmitted a copy of the actual Policy which forbids ARS investments in securities with interest rate caps.

29. UBS acknowledged receipt of the January 9, 2007 e-mail.

30. Despite Plug Power's express Policy to the contrary, UBS invested $62,875,000 in auction rate securities with interest rate caps. All of these non-conforming ARS investments were made or renewed by UBS after January 9, 2007.

31. Each of the 18 individual ARS investments made by UBS from the Plug Power account was made in an ARS backed by federally guaranteed student loans.

32. In a call with UBS investment advisor Louis Paster in October 2007, Plug Power Chief Financial Officer Gerry Anderson raised concerns about the ARS products and reiterated that Plug Power needed liquidity and capital preservation. Paster stated that the ARS investments secured by guaranteed student loans were safe and liquid investments. Instead of moving Plug Power's investments into liquid assets, such as a money market investments or Treasury bills, UBS kept the same ARS investments that violated Plug Power's investment policy.

33. On February 14, 2008, UBS notified Plug Power that the auction rate securities market "seized up" and that the liquidity Plug Power had depended upon was "unavailable." Paster, on behalf of UBS, said the "liquidity problem" could be resolved in "90 days or perhaps in one year (or longer)."

34. Plug Power instructed UBS to liquidate its holdings in ARSs, but since February 14, 2008, every auction of the ARS securities owned by Plug Power has failed to provide liquidity.

35. The aggregate face amount of such ARS investments was at that time $62,875,000.

36. As a result of the failure of the auctions, the investments are not liquid and Plug Power is not able to liquidate its investments in ARSs without a substantial discount. Further, because the ARSs purchased by UBS have capped interest rates, the interest paid on Plug Power's ARSs is far below the rates UBS told Plug Power it would receive on the ARSs and are far below the default rates that UBS represented that Plug Power would receive.

### UBS Was Aware Before 2008 That Its ARS Investments Posed Liquidity Risks In Violation of Plug Power's Investment Policy

37. The February 2008 "seizing" of the ARS market was not the first liquidity problem to arise with ARSs.

38. According to Financial Week, a major failure occurred in 2002 when a Zurich Financial auction rate security failed because there were fewer buyers than sellers. The existence of historic failures should have been, but were not, disclosed to Plug Power. Historic failures in ARS auctions should also have alerted UBS that ARS investments were not in accordance with the liquidity objectives of Plug Power's investment policy.

7

39. In 2002, the Securities and Exchange Commission opened an investigation related to manipulation and conflicts of interest in the ARS market. That investigation ultimately resulted in a settlement in which various broker-dealers agreed to pay a $13 million penalty.

40. In 2005, the liquidity of ARS investments temporarily declined. Although there were not failed auctions associated with this decline in liquidity, the downturn was reflected in widening yield spreads as the demand for ARS investments sharply decreased.

41. In August 2007, a number of ARS auctions failed and the market for such investments began to deteriorate.

42. On September 17, 2007, Financial Week reported that "at least 60 auctions have failed in recent weeks."

43. Throughout the fall of 2007, other brokers and investment advisors began advising clients to liquidate their ARS holdings, in light of the failed auctions and increased liquidity risks. UBS did not notify Plug Power of these risks, nor did UBS move Plug Power investments out of ARSs and into more liquid securities.

44. Since February 14, 2008, when UBS contacted Plug Power to explain that the auction rate securities market "seized up" and that liquidity was no longer available, there has been limited alternative markets for the ARS securities.

45. On May 4, 2008, the New York Times reported that student loan ARSs – which are the type purchased by UBS on behalf of Plug Power – are the "hardest to sell" in alternative markets, where discounts for such securities are "25 percent or more."

## CAUSES OF ACTION

## COUNT I

**(Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.)**

46. Plug Power repeats and realleges the allegations as set forth in paragraphs 1-45 above as if set forth fully herein.

47. Defendant UBS Financial is an investment advisor under the Investment Advisers Act, 15 U.S.C. § 80b-1 et seq., which entered into an express brokerage commitment with Plug Power. UBS Financial engages in the business of advising Plug Power directly as to the value of securities and as to the advisability of investing in, purchasing, or selling securities as defined at 15 U.S.C. § 80b-2(11).

48. Defendant UBS Financial receives special compensation for its services related to auction rate securities.

49. Under the Investment Advisers Act, Defendant UBS Financial, as investment advisors, owed Plug Power a fiduciary duty to fully and fairly disclose all material facts, and an affirmative obligation to follow Plug Power's Investment Policy in making all investments.

50. In breach of their fiduciary duty to Plug Power, Defendant UBS Financial, as outlined above, made misrepresentations concerning the suitability of ARS investments for Plug Power and concealed and omitted material facts concerning their actions as financial advisors to Plug Power, thereby deceiving Plug Power with full knowledge that such representations, or omissions, resulted in false and misleading information. Such false and misleading information led Plug Power to believe both that its ARS investments were made in accordance with its investment policy and that its ARS investments were liquid.

51. Further, Defendant UBS AG acquired rights under, and was benefited by, Defendant UBS Financial's acts and conduct as set forth above and had actual knowledge of the conduct engaged in by Defendant UBS Financial that violated the Investment Advisers Act.

52. As a result of Defendant UBS Financial's breaches of fiduciary duty, Plug Power's purchase, investment, or acquisition of ARS securities are void under Section 15 U.S.C. of the Investment Advisers Act, 15 U.S.C. § 80b-15(b).

53. Therefore, Plug Power seeks a declaratory judgment that the ARS transactions with UBS are void. Plug Power also seeks an accounting and restitution, as well as disgorgement of all profits made by UBS due to its conduct in violation of the Investment Act.

## COUNT II

### (Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) and SEC Rule 10-b(5), 17 C.F.R. § 240.10(b)-5 (2007))

54. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 53 above as if specifically alleged in this count.

55. UBS, in the manner described in the above paragraphs, and in connection with the purchase and sale of ARSs, used instrumentalities of interstate commerce or the mails, directly or indirectly to make untrue statements of material facts or omissions of material facts, causing damages and financial losses to Plug Power.

56. UBS held a fiduciary relationship with Plug Power and, as a result, had a duty to disclose all material facts with regard to the investments UBS purchased on Plug Power's behalf.

57. UBS knowingly supplied false information with regard to the liquidity of the ARS in which Plug Power's assets were invested. UBS stated that the ARSs were virtually equivalent to money market investments or cash.

58. UBS also falsely led Plug Power to believe that its investments in the ARS conformed with the Plug Power investment policy, while UBS knew or should have known that the capped interest rate ARSs in the Plug Power portfolio violated the Plug Power investment policy.

59. UBS representatives, in answer to Plug Power's questions in October 2007 concerning the suitability of its ARS investments, also stated that the ARS investments secured by guaranteed student loans were safe and liquid investments. UBS failed to disclose the deficiencies inherent in ARS investments and also failed to disclose the fact that ARS auctions had failed in the past.

60. Plug Power justifiably relied upon the UBS misrepresentations and omissions of material fact, and these misrepresentations and omissions of material fact caused Plug Power to suffer damages and financial loss.

## COUNT III

### (Breach of Fiduciary Duty)

61. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 60 above as if specifically alleged in this count.

62. Plug Power reposed trust and confidence in UBS by vesting it with discretion over its investment accounts. Plug Power's trust and confidence was based upon UBS's reputation as financial experts. Plug Power reasonably relied upon the purported expertise of UBS in bestowing trust and confidence in UBS.

63. By accepting discretion over Plug Power's investment accounts, UBS accepted the trust and confidence that Plug Power bestowed upon it and thereby assumed a fiduciary duty to Plug Power.

64. UBS breached its fiduciary duty to Plug Power by investing in ARS vehicles that did not comply with Plug Power's investment policy. UBS compounded its breach of fiduciary duty when it advised Plug Power in October 2007 that its ARS investments were safe and liquid.

65. Plug Power has suffered and will suffer damage and financial loss as a result of UBS's breach of the fiduciary duty owed to Plug Power.

## COUNT IV

### (Breach of Contract)

66. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 65 above as if specifically alleged in this count.

67. The Account Agreement between UBS and Plug Power is a valid, binding contract.

68. Pursuant to the Account Agreement, UBS agreed to manage Plug Power's investment accounts.

69. An express term of the Account Agreement was that UBS would invest Plug Power's assets only in accordance with Plug Power's investment policy.

70. UBS was obliged to manage Plug Power's account in good faith and in compliance with Plug Power's investment policy.

71. UBS breached the Account Agreement and its contractual duty of good faith and fair dealing by disregarding Plug Power's investment policy restricting ARS investments to those ARS vehicles without capped interest rates. In breach of the agreement, UBS invested in ARS securities with capped interest rates.

72. UBS further breached the Account Agreement and violated its contractual duty of good faith and fair dealing by disregarding Plug Power's stated objectives in its investment policy, stating a preference for liquid investments over all other investments, and in failing to invest Plug Power's funds in a suitable and safe investment.

73. Plug Power has suffered and will continue to suffer damages and financial loss as a result of UBS's breach of contract and breach of the contractual duty of good faith and fair dealing.

## COUNT VI

### (Fraud)

74. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 73 above as if specifically alleged in this count.

75. Representatives of UBS made material misrepresentations or omissions to Plug Power concerning its ARS investments, with knowledge that those misrepresentations or omission would be justifiably relied upon by Plug Power in connection with the decision not to sell its ARS investments prior to the time that the auctions for such securities failed in February 2008;

76. Specifically, UBS knowingly supplied false information with regard to the liquidity of the ARSs in which Plug Power's assets were invested. UBS stated that the ARSs were virtually equivalent to money market investments or cash.

77. UBS also falsely led Plug Power to believe that its investments in the ARS conformed with the Plug Power investment policy, while UBS knew or should have known that the capped interest rate ARSs in the Plug Power portfolio violated the Plug Power investment policy.

78. UBS representatives, in answer to Plug Power's questions in October 2007 concerning the suitability of its ARS investments, also stated that the ARS investments secured by guaranteed student loans were safe and liquid investments. UBS failed to disclose the

deficiencies inherent in ARS investments and also failed to disclose the fact that ARS auctions had failed in the past.

79. Plug Power justifiably relied upon the UBS misrepresentations and omissions of material fact, leading Plug Power to suffer damages and financial loss.

## COUNT VI

### (Negligent Misrepresentation)

80. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 79 above as if specifically alleged in this count.

81. Representatives of UBS negligently made representations in the course of its business or in which it had a pecuniary interest to Plug Power.

82. UBS supplied false information with regard to the liquidity of the ARS in which Plug Power's assets were invested. UBS stated that the ARSs were virtually equivalent to money market investments or cash.

83. UBS, in answer to Plug Power's questions in October 2007 concerning the suitability of its ARS investments stated that the ARS investments secured by guaranteed student loans were safe and liquid investments. UBS failed to disclose the deficiencies inherent in ARS investments and also failed to disclose the fact that ARS auctions had failed in the past.

84. UBS also falsely led Plug Power to believe that its investments in the ARS conformed with the Plug Power investment policy, while UBS knew or should have known that the capped interest rate ARSs in the Plug Power portfolio violated the Plug Power investment policy.

85. UBS did not exercise reasonable care or competence in obtaining or communicating the information regarding the nature of the ARS investments in which it had invested the assets of Plug Power.

86. UBS knew that Plug Power would rely on its representations and Plug Power did, in fact, justifiably rely on those representations and suffered damages as a result.

87. Plug Power has suffered and will continue to suffer significant damages as a result of UBS's misrepresentations regarding the risk associated with ARSs and the unsuitability of ARSs for Plug Power's investment objectives.

## COUNT VII

### (NY General Obligations Law § 349)

88. Plug Power incorporates by reference all of the factual allegations set forth in paragraphs 1 through 87 above as if specifically alleged in this count.

89. UBS engaged in deceptive acts or practices in leading Plug Power to purchase and to retain ARSs, causing Plug Power to suffer injury as a result of UBS's deceptive acts.

90. Representatives of UBS made material misrepresentations or omissions to Plug Power concerning its ARS investments, with knowledge that those misrepresentations or omission would be justifiably relied upon by Plug Power in connection with the decision not to sell its ARS investments prior to the time that the auctions for such securities failed in February 2008;

91. Specifically, UBS knowingly supplied false information with regard to the liquidity of the ARS in which Plug Power's assets were invested. UBS stated that the ARSs were virtually equivalent to money market investments or cash.

92. UBS also falsely led Plug Power to believe that its investments in the ARS conformed with the Plug Power investment policy, while UBS knew or should have known that the capped interest rate ARS in the Plug Power portfolio violated the Plug Power investment policy.

93. UBS representatives, in answer to Plug Power's questions in October 2007 concerning the suitability of its ARS investments, also stated that the ARS investments secured by guaranteed student loans were safe and liquid investments. UBS failed to disclose the deficiencies inherent in ARS investments and also failed to disclose the fact that ARS auctions had failed in the past.

94. Plug Power suffered damages and financial loss as a result of UBS's deceptive acts and practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court issue an order:

A. Rescinding the investment agreement with UBS and requiring UBS to return the funds that Plug Power entrusted to UBS;

B. Disgorgement of all profits earned by UBS through the purchase and sale of ARS on behalf of Plug Power.

C. Awarding compensatory and punitive damages;

D. Awarding pre- and post-judgment interest;

E. Awarding attorney fees and costs incurred in prosecuting this action, and;

F. Awarding any other remedies that the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

Dated: May 8, 2008                    Respectfully submitted,

                                      BOIES, SCHILLER & FLEXNER LLP

                                      _____
                                      George Carpinello
                                      10 North Pearl Street, 4th Floor
                                      Albany, New York  12207
                                      (518) 434-0600

S:\wpdata\7277002\Complaint UBS.doc